# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 20, 2011

## STATE OF TENNESSEE v. KEITH A. HOWARD

**Appeal from the Criminal Court for Sumner County**
**No. 706-2008     Dee David Gay, Judge**

---

**No. M2010-00578-CCA-R3-CD - Filed August 9, 2011**

---

A Sumner County Criminal Court jury convicted the defendant, Keith A. Howard, of one count of forgery, *see* T.C.A. § 39-14-114 (2006), and one count of attempting to evade sales tax, *see id.* § 67-1-1440(g), and the trial court imposed consecutive sentences of six years' incarceration as a Range III, persistent offender. On appeal, the defendant contends that the trial court erred in its instructions to the jury and admission of evidence, that the evidence is insufficient to support his convictions, and that the trial court erred by sentencing the defendant as a persistent offender and by imposing consecutive sentences. Because the defendant failed to file a timely motion for new trial, all issues except the sufficiency of the evidence and sentencing are waived. Discerning no error in those remaining issues, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

Daniel D. Warlick, Nashville, Tennessee (at trial), for the appellant; Keith A. Howard, pro se (on appeal).

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Thomas Dean, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant's convictions stem from an elaborate scheme of fraud centering around his supposed operation of a bus leasing company, Stagecoach America. On January 8, 2007, the defendant presented a title application for a recently purchased 2005 Prevost

touring bus to the Sumner County Clerk's Office. The title application listed "Stagecoach America Incorporated" as the owner of the bus, and the defendant signed the application as a representative of "Stagecoach America, Inc." Along with the title application, the defendant presented to the county clerk a certificate of title indicating that on December 21, 2006, Tommy Burnett, a representative of Stagecoach America, purchased the bus from The Shepherd's Call for a purchase price of $62,500, although the stated price appeared to have been altered at some point.

Carolyn Templeton, an employee of the county clerk's office, explained generally that when a certificate of title "looks like it has been altered" or if the listed purchase price is not comparable to Kelley Blue Book value, the applicant is required to file additional affidavits or to obtain an appraisal of the vehicle. In the defendant's case, because the purchase price seemed low and appeared to have been altered, the defendant filed an affidavit of non-dealer transfer and an affidavit for personal use concerning the bus. The affidavit of non-dealer transfer, purportedly signed by Tommy Burnett, also averred a purchase price of $62,500. The affidavit for personal use was signed by the defendant. Ms. Templeton said that the defendant signed the title application at the county clerk's office, but that Mr. Burnett was not present to sign any of the accompanying documents.

Larry Kevin White testified that he was a former Vice President and loan officer at Heritage Bank and Trust in Columbia, Tennessee, which provided financing for the sale of the 2005 Prevost bus. A customer, The Shepherd's Call, contacted Mr. White and identified the defendant as the purchaser of the bus. Mr. White discussed the loan process with only the defendant. The defendant told Mr. White that Stagecoach America was the purchaser of the bus and that the defendant and Mr. Burnett, who the defendant indicated was his brother-in-law, would be the guarantors of the loan. Mr. White then explained that the bank required three years of corporate and personal tax returns and a personal financial statement to determine suitability for the loan. The defendant provided the bank three years of corporate tax returns for Stagecoach America, three years of personal tax returns for Mr. Burnett, and a personal financial statement of Mr. Burnett.

Based upon the averments contained in these documents, Heritage Bank and Trust loaned $635,000 for the purchase of the bus. Out of the $635,000, $625,000 covered the purchase price and the additional $10,000 was to be used to pay the sales tax, in part, with additional funds being paid by Stagecoach America to cover the full cost of the sales tax. Mr. White recalled that at the closing, the defendant received the additional $10,000 in a check made out to the Sumner County Clerk's Office. He could not recall, however, why the single $10,000 check was later returned to the bank and converted to two $5,000 checks – one made payable to the Sumner County Clerk's Office and the other made payable to Anthony RV, another purported company owned by the defendant. Further evidence

revealed that both checks were endorsed and deposited into a corporate account for Anthony Builders. Mr. White had never heard of Anthony RV but was aware of the defendant's association with Anthony Builders.

Mr. White testified that when the first loan payment was due, the defendant paid it late with a check drawn from the Anthony Builders account. That check, however, was returned for insufficient funds. Mr. White contacted the defendant concerning the loan payment and, the following month, the defendant sent another check drawn from the Anthony Builders account. This check also was returned for insufficient funds. As lien holder, Heritage Bank received a title registration form indicating the correct purchase price of $625,000. Mr. White denied ever seeing the altered document that was presented to the clerk's office.

Mr. White testified that he only discussed financing the bus with the defendant and that he first met Mr. Burnett at the December 21, 2006 loan closing. Mr. White recalled that Mr. Burnett personally did not earn enough to qualify for the loan. Despite being the loan officer on the account, he was unaware that Stagecoach America was not incorporated in Tennessee at the time of the loan. Thus, he admitted that he had reviewed unsigned corporate tax returns from a company that did not even exist as evidence of credit worthiness for the loan application. Mr. White testified that the defendant represented to him that the defendant was Vice President of Stagecoach America. Mr. White affirmed that the defendant was fully aware that the purchase price of the bus was $625,000. Mr. White also affirmed that Stagecoach America, as purchaser of the bus, was responsible for the payment of the sales tax.

Onnie Kirk testified that he runs a mentoring program for "fatherless boys" in the North Nashville area of Bordeaux. Mr. Kirk grew up with Mr. Burnett in El Paso, Texas, and, upon learning that Mr. Burnett had retired from teaching, asked Mr. Burnett to move to Nashville to work in his program. The defendant had also associated with the program and offered Mr. Burnett a place to stay until housing for the program was completed. Through Mr. Burnett, Mr. Kirk became aware of "a situation between [the defendant] and Mr. Burnett where a bus was purchased and [the defendant] had submitted papers, tax returns, so forth in Mr. Burnett's name without Mr. Burnett's knowledge." Mr. Kirk also learned that "the bank was coming at Mr. Burnett saying that he owed money for something that he had nothing to do with other than signing some papers that [the defendant] had told him to sign." Mr. Kirk averred that "there were many things in that transaction that were not true."

When Mr. Kirk learned of the issues surrounding the bus loan, he arranged a meeting between the defendant and Mr. Burnett. During the meeting, the defendant never denied his responsibility and told Mr. Kirk "that he was the one who had set all of this up."

In speaking with Mr. Kirk, the defendant voiced a desire to salvage his friendship with Mr. Burnett. Mr. Kirk advised the defendant to write Mr. Burnett a letter expressing his responsibility and "exonerating" Mr. Burnett from any involvement in the loan transaction. In the letter signed by the defendant, which was admitted at trial, the defendant "acknowledge[d] that [he was] fully responsible for all deceptive practice's [sic] in preparing Tax Returns, and Financial Statements in connection with the financing arrangement's [sic] of the 2005 Prevost XLII coach. At no time did Tommy Burnett have awareness to my specific actions." In the letter, the defendant also avers that "Tommy Burnett should be held harmless of any wrong doing on [the defendant's] part." Mr. Kirk testified that the defendant openly admitted his complicity in the bank dealings, but he did not mention anything concerning sales tax evasion surrounding the registration of the bus.

William Nidiffer worked for The Shepherd's Call youth ministry in 2006 at the time of the ministry's sale of the 2005 Prevost bus. The defendant contacted Mr. Nidiffer on January 7, 2007, concerning an unsigned piece of paperwork the defendant needed to register the title of the bus. Coincidentally, Mr. Nidiffer had just resigned that morning to pursue other ministry opportunities, so he told the defendant that Dawson McAlister, President of the Shepherd's Call, would have to sign the document. When the defendant met with Mr. Nidiffer later that day, the defendant presented a blank document that "he needed to get signed." Mr. Nidiffer told the defendant that he would not allow Mr. McAlister to sign the document until it was "filled in." Mr. Nidiffer checked to make sure the document reflected a purchase price of $625,000. Mr. Nidiffer never saw a document reflecting a purchase price of $62,500. When presented with the non-dealer transfer affidavit at trial, Mr. Nidiffer said that the purported seller signature on the document was neither his nor Mr. McAlister's signature and that the seller's signature appeared to have been forged.

Tommy Ray Burnett testified that he first became acquainted with the defendant in April 2006 through his work in Mr. Kirk's ministry, the Family Foundation Fund. The defendant provided Mr. Burnett temporary housing and also assisted with the ministry's transportation needs on a daily basis.

In the fall of 2006, Mr. Burnett planned a trip home to Texas for Thanksgiving. He planned on taking his two "surrogate sons," boys he was mentoring through the ministry program, and the defendant also planned on accompanying Mr. Burnett with his "surrogate son." The defendant told Mr. Burnett that he would obtain a tour bus and driver "from his fleet" in Alabama to drive them comfortably to Texas. While on the trip, Mr. Burnett talked to the bus driver, Craig Turner, and learned that the bus was not owned by the defendant and that Mr. Turner had never met the defendant.

Mr. Burnett confronted the defendant about his claim that he owned the bus.

-4-

The defendant told Mr. Burnett that the bus was "part of his fleet" but that an individual named McAlister was interested in purchasing the bus from him. The defendant then segued this conversation into a discussion of business opportunities in the charter bus industry. The defendant convinced Mr. Burnett to become involved in the purchase of a bus. The defendant assured Mr. Burnett that "[t]here would not be any money up front; you know, I'll take care of you." Mr. Burnett said that he "believed in [the defendant]," so he agreed to enter into business with him.

Sometime before Christmas 2006, Mr. Burnett attended a loan closing. He recalled that "there was going to be the signing of the papers and [the defendant] wanted [him] to be there" so he delayed his trip home to Texas. Mr. Burnett said that, on their way to the closing, the defendant told him that his lawyer "could not make out the papers the way we wanted with [our] name[s] as partners but he made it out in Stagecoach America." Mr. Burnett agreed to this arrangement with the defendant's repeated assurance that he would "take care of [him]."

When presented with paperwork at the closing indicating that Mr. Burnett was president of Stagecoach America, Mr. Burnett told Mr. White that he was not. Mr. Burnett testified that Mr. White then told him that the papers would have to be redone, causing a delay in the closing, or that Mr. Burnett could sign the papers with the defendant's permission. The defendant agreed, and Mr. Burnett "started signing papers." When Mr. Burnett came upon a document obligating him as guarantor on the loan, he again voiced concern over the loan. The defendant assured Mr. Burnett that there was "no problem," so Mr. Burnett continued to sign papers.

Mr. Burnett said that the defendant presented himself as a successful Christian businessman, so he had no reason to doubt the defendant's assurances. He recalled that "[e]verything was fine and dandy" until he began receiving telephone calls from the bank concerning the loan payments. He asked the defendant what was going on, and the defendant told him that "a glitch" had occurred in one of the checks but that he had taken care of it. When Mr. Burnett continued to receive telephone calls from the bank, he went to the bank on his own to investigate what was going on with the loan. At the bank, he viewed the entire package of loan documents. He recalled the documents included tax returns purported to be his. Mr. Burnett said that the tax returns were not accurate because they showed his "assets were gigantic and [that he] was making a lot" more than he actually earned. He told the bank that the documents were inaccurate and that he had had nothing to do with their creation. After confronting the defendant through the meeting with Mr. Kirk, the defendant admitted his fraudulent practices surrounding the loan.

Ultimately, after several failed assurances by the defendant to take care of the

loan payments, the bank repossessed the bus and sold it at a "short sale." The bank then sued Mr. Burnett, the defendant, and Stagecoach America for the deficiency balance on the loan. Believing he was not involved, Mr. Burnett failed to defend against the lawsuit. The bank obtained a default judgment against Mr. Burnett for over $170,000.

Mr. Burnett testified that he never took possession of the bus, that he never received any proceeds from the operation of the bus, that he did not negotiate with the bank regarding the sale or financing of the bus, and that he had nothing to do with registering the bus in Sumner County. He never reviewed any bank documents prior to the closing and only signed with the defendant's permission to prevent a delay of the closing. Through his later investigation, he learned that he had unwittingly become a continuing guarantor on not only the present loan but also on any future loans the defendant might seek on behalf of Stagecoach America. Mr. Burnett testified that he did not actually sign any of the documents presented to the Sumner County Clerk's Office by the defendant when the defendant registered the bus. Mr. Burnett reiterated that "[w]ith faith in [the defendant] and his goodness and kindness, [he] had no worry" at the time the bus was purchased. He testified that he never falsified any documents and that the defendant had instigated and orchestrated it all. Mr. Burnett said that since his business dealings with the defendant, he had moved back to Franklin, Texas and had begun teaching again.

Special Agent Russ Lassiter of the Tennessee Department of Revenue (TDR) criminal investigations division testified that TDR received a referral from the Sumner County Clerk's Office in February 2008 regarding a suspected forged document concerning the registration of the 2005 Prevost bus. After some initial difficulty, Special Agent Lassiter located the defendant in Franklin, Tennessee in late March 2008. The defendant agreed to an interview with his attorney present.

During the interview, the defendant presented himself as President of Stagecoach America, a tour bus leasing business incorporated in Delaware. The defendant admitted knowledge of Mr. Burnett's purchasing a bus sometime in late 2006. He, however, denied any specific knowledge of the details concerning the purchase. The defendant claimed not to know that Stagecoach America would be listed on any of the purchase documents. He admitted attending the closing, "but [he said] that he was in no way involved in the transaction or the purchase of the bus for Stagecoach America."

The defendant denied knowledge of the two $5,000 checks issued by Heritage Bank. He denied knowledge of any of the financing terms. He disavowed knowledge of the purchase price of the bus. He denied providing any documents to Heritage Bank. Although he acknowledged his signature on the title application and affidavit of personal use submitted to the Sumner County Clerk's Office, he denied knowledge of the certificate of title, which

contained an altered purchase price, and of the affidavit of non-dealer transfer, which contained an inaccurate purchase price. When asked why his signature appeared on some of the documents if the defendant had absolutely nothing to do with the purchase of the bus, the defendant began to answer, "When I was registering the bus . . . ." Special Agent Lassiter testified that "at that point [the defendant] stopped answering any more questions."

Through his investigation, Special Agent Lassiter learned that "Stagecoach America, Inc." was a registered Maryland corporation that had been "administratively dissolved" prior to the purchase of the bus in late 2006. By researching Tennessee's corporate registry, he learned that "Anthony Builders, LLC" filed Articles of Organization on September 6, 2006, and that the company's name was changed to "Stagecoach America, LLC" on March 16, 2007. Notably, the defendant's name was listed as the sole managing member of the company. Mr. Burnett's name was not listed on any company documents filed with the Secretary of State. Based upon Agent Lassiter's investigation, the TDR concluded that the defendant was the person who registered the bus and attempted to evade the sales tax, so he was prosecuted.

Based upon this evidence, the jury convicted the defendant, as indicted, of forgery and attempted sales tax evasion. At the November 20, 2009 sentencing hearing, the parties stipulated that the defendant qualified for sentencing as a Range III, persistent offender based upon his history of criminal convictions. The State also presented detailed proof of other fraudulent business dealings undertaken by the defendant subsequently to his purchasing and registering of the 2005 Prevost bus. The trial court ordered the defendant to serve two sentences of six years' incarceration consecutively based upon its finding that "the defendant is an offender whose record of criminal activity is extensive." *See* T.C.A. § 40-35-115(b)(2).

Initially, the State asks this court to disregard the issues on appeal, save sufficiency of the evidence and sentencing, because the defendant failed to file a motion for new trial. The record reflects that the trial court entered the judgments of conviction on November 20, 2009. On March 10, 2010, the defendant filed a pro se notice of appeal. What occurred relative to the defendant's representation by counsel or the filing of any post-judgment motion is not apparent on the record before this court. On April 9, 2010, however, this court accepted the late-filed notice of appeal as timely filed.

"A motion for a new trial shall be made in writing, or if made orally in open court shall be reduced to writing, within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). "This provision is mandatory, and the time for the filing cannot be extended." *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997); *see* Tenn. R. Crim. P. 45(b). The failure to timely file the motion for new trial "deprives the appellant of the

opportunity to argue on appeal any issues that were or should have been presented in the motion." *Martin*, 940 S.W.2d at 569. Issues which should be raised in a motion for new trial include evidentiary issues, jury instruction complaints, misconduct of jurors, parties or counsel, "or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought." Tenn. R. App. P. 3(e). Because the defendant failed to file a motion for new trial, any issues raised on appeal that would result in a new trial are waived. *Id.*; *Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). We also note that the defendant urges this court, in his reply brief, to review any errors that we deem "necessary to do substantial justice." *See* Tenn. R. App. P. 36(b). After a full and thorough review of the record before this court, we conclude that none of the defendant's waived errors merit such review.

On the other hand, it is not necessary to file a motion for a new trial to obtain appellate review of a claim that the evidence is insufficient to support the conviction. *See, e.g.*, *State v. Patterson*, 966 S.W.2d 435, 440 (Tenn. Crim. App. 1997). Indeed, any issues that would result in a dismissal may still be reviewed by this court. Tenn. R. App. P. 3(e); *State v. Williams*, 675 S.W.2d 499, 501 (Tenn. Crim. App. 1984). Accordingly, we conclude that all of the defendant's issues are waived except his challenges to the sufficiency of the evidence and sentencing.

*Sufficiency of the Evidence*

The defendant argues that the evidence is insufficient to support his convictions. At the center of his argument is his contention that the State failed to prove that he was the owner of the 2005 Prevost bus and that, absent this proof, he cannot be held liable for any forgery or attempted sales tax evasion surrounding the title registration. He also contends that there is no proof that he forged Mr. Burnett's signature to establish the forgery offense. The State argues that the evidence is sufficient to establish forgery in that the defendant altered the sales price from $625,000 to $62,500 on documents presented to the Sumner County Clerk's Office. Furthermore, the State argues that the actual ownership of the bus is of no consequence and that, by altering the sales price and reducing it by 90 percent, the defendant attempted to evade over $39,000 of the actual sales tax due on the vehicle.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a

combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

Tennessee Code Annotated section 39-14-114(a) provides that "[a] person commits an offense who forges a writing with intent to defraud or harm another." Section 38-14-114(b) further provides:

(b) As used in this part, unless the context otherwise requires:

(1) "Forge" means to:

(A) Alter, make, complete, execute or authenticate any writing so that it purports to:

(i) Be the act of another who did not authorize the act;

(ii) Have been executed at a time or place or in a numbered sequence other than was in fact the case; or

(iii) Be a copy of an original when no such record existed;

(B) Make false entries in books or records;

(C) Issue, transfer, register the transfer of, pass,

-9-

publish, or otherwise utter a writing that is forged within the meaning of subdivision (b)(1)(A); or

(D) Possess a writing that is forged within the meaning of subdivision (b)(1)(A) with the intent to utter it in a manner specified in subdivision (b)(1)(C); and

(2) "Writing" includes printing or any other method of recording information, money, coins, tokens, stamps, seals, credit cards, badges, trademarks, and symbols of value, right, privilege or identification.

T.C.A. § 39-14-114(b).

In this case, the count of the indictment charging forgery alleged that the defendant altered the certificate of title to reflect a purchase price of $62,500. The evidence showed that the defendant presented to the Sumner County Clerk several documents understating the purchase price of the 2005 Prevost bus. The certificate of title clearly indicates that the purchase price was altered from $625,000 to $62,500. The evidence further showed that the defendant negotiated the purchase and financing of the bus and was, therefore, well aware of the correct purchase price. By presenting the altered certificate of title, the defendant avoided the payment of over $39,000 in sales tax and defrauded the State of Tennessee of that lawful revenue. Accordingly, we conclude that the evidence is sufficient to support the defendant's conviction of forgery.

Relative to the defendant's conviction of attempting to evade sales tax, the Code provides that "[i]t is a Class E felony for *any person* willfully to attempt in any manner to evade or defeat any tax due the state of Tennessee." T.C.A. § 67-1-1440(g) (emphasis added).

The Sumner County Clerk identified the defendant as the person who presented the altered certificate of title. Regardless of whether any documents presented to the clerk reflected the defendant as the owner of the bus, the defendant was the person who willfully attempted to evade the sales tax when he presented the forged document to the clerk in reference to the registration of the vehicle and payment of the sales tax. In his statement to Special Agent Lassiter, the defendant admitted that he "passed" the altered certificate of title

-10-

to the clerk. The evidence showed that the defendant, through an elaborate scheme of trickery and fraud, attempted to shield himself from any liability concerning the purchase of the bus when, by his own admissions to Mr. Kirk and Mr. Burnett, the defendant claimed to have "creat[ed]" many of the documents "because he wanted that bus." Additionally, on the title application, the owner of the bus was listed as Stagecoach America. Subsequently to the transactions, Stagecoach America was registered with the Secretary of State as a limited liability company; the defendant was listed as the sole managing member of the company. Accordingly, we conclude that the evidence is sufficient to support the defendant's conviction of attempted sales tax evasion.

*Sentencing*

The defendant also contends that the trial court erred by sentencing him as a Range III, persistent offender and by imposing consecutive sentences. The State argues that the trial court properly sentenced the defendant. At the outset, we note that, at the November 20, 2009 sentencing hearing, the defendant stipulated his qualification as a Range III offender, and we see no evidence in the record that would call into question his classification. Therefore, we will limit our review of the trial court's sentencing determination to the imposition of consecutive sentences.

At the sentencing hearing, the State presented detailed evidence of the defendant's many prevarications and fraudulent schemes that persisted during the pendency of the trial of this case. Scott Little of the Tennessee Board of Probation and Parole testified that he prepared the presentence report concerning the defendant's case. During interviews with the defendant, the defendant did not deny his criminal history.[1] He did, however, deny altering any records relevant to this case. He further denied writing the letter to Mr. Burnett in which he claimed responsibility for the fraudulent acts surrounding the procurement of the bus. The defendant also reported to Mr. Little that he had custody of his 13-year-old biological son and had not seen his estranged girlfriend, the child's mother, since 1998.

Contrary to the defendant's report of having custody of his biological son, LaTonya Garrett of the Sumner County Office of the Department of Children's Services (DCS) testified that she investigated allegations of psychological harm relative to the defendant's child. Through her investigation, she discovered that the child was not the

---

[1] In fact, at sentencing, the defendant stipulated the accuracy of his criminal history contained in the presentence report.

defendant's biological son and that the child had been adopted in September 2009, contemporaneously to the defendant's trial in this case. Ms. Garrett testified that "[t]his adoption will be the first time [the defendant has acted] as a parental figure." The child's mother's parental rights had been terminated due to her drug abuse, and the child had siblings residing in Florida. Ms. Garrett testified that DCS had concerns about the child's care and had inquired about child-care arrangements in the event the defendant was sentenced to a term of imprisonment. She reported, however, that her "assessment was impeded by [the defendant's] non-cooperation" and that the child was now "at risk of coming into custody today" because adequate arrangements had not been made by the defendant.

Nicholas Edwin Audino, owner of Superior Coach Interiors, Inc. of Lebanon, Tennessee (Superior), testified that "[w]ithin the past couple of years" the defendant contracted with him to refurbish the interior of a bus he had recently purchased. Mr. Audino said that "in the beginning [the deal] went fine, without a glitch." The defendant successfully delivered the first installment payment; but when Mr. Audino's company requested the second payment, the bank denied payment. Upon inquiry, Mr. Audino learned that the bank employee responsible for loan disbursements "had been terminated abruptly." Mr. Audino contacted the defendant, who arrived several days later with a $75,000 cashier's check drawn from Wachovia Bank. This check listed Superior as the payor and the defendant's company as the recipient, so Mr. Audino refused the check. Several days later, the defendant presented what appeared to be a properly executed check which Mr. Audino's book keeper immediately deposited. Fortuitously, Mr. Audino was visiting his bank when the check arrived for deposit, a teller immediately recognized the check as "fake," and the check was returned. The defendant's passing the fake check resulted in his indictment for forgery in Wilson County. Mr. Audino testified that because he had previously received verification of financing from the defendant's bank, he eventually recovered his expenses from the bank in order to avoid placing a mechanic's lien on the bus. Mr. Audino testified that all of these dealings occurred in Spring 2009 while this case was pending trial.

Greg Carlson of BB&T Bank testified that he arranged the loan for the contract between the defendant and Superior Coach Interiors. He recalled that Simmons and Rice, LLC was listed as the debtor on the loan but that the defendant was listed as a guarantor. Per normal practice, the bank would wire loan disbursements to Superior as stages of work were completed. Mr. Carlson later learned that the account information provided by the defendant to wire the disbursements to Superior actually contained the defendant's bank account routing information. Therefore, the defendant received the disbursements meant for Superior.

In testimony notably reminiscent of Mr. Burnett's testimony, Barry Dale Rice testified that he met the defendant through a mutual friend, Bernard Simmons, and that the defendant convinced Mr. Rice and Mr. Simmons to invest in the bus industry. The defendant suggested that Mr. Rice and Mr. Simmons "form a small sister company." The defendant promised the men that Stagecoach America would "co-sign as the financial muscle" behind all transactions. The defendant managed the money and handled all of the financial documents. Mr. Rice recalled that he resigned his job as a long-time employee of Gaylord Opryland Resort at the defendant's behest and based upon the defendant's showing him multiple tour contracts that would amount to approximately $90,000 for each man. Mr. Rice said that "all of a sudden, [there was] no money." He reported that "[i]ncident after incident [occurred] that continued to alarm us." He learned that the defendant passed a fraudulent check to Superior Coach Interiors. Mr. Rice filed identity theft charges against the defendant upon learning that the defendant had used Mr. Rice's identity to purchase a Cadillac Escalade. The defendant forged his signature on other documents pertaining to the business also. Mr. Rice testified that he and Mr. Simmons eventually learned that the defendant sold all of the buses and kept the money for himself. He said, "All we got was lie after lie after lie," and we "have not seen one red cent." Mr. Rice testified that he is now being sued for over $2.5 million for business transactions involving the defendant.

Special Agent Lassiter investigated forged documents linked to Mr. Rice's purchase of a 2007 Prevost bus. Again in the Sumner County Clerk's Office, the defendant signed and presented a title application for the bus. The application reflected a purchase price of $56,345. When Special Agent Lassiter asked Mr. Rice if that was the correct purchase price, Mr. Rice responded, "Absolutely not." Special Agent Lassiter testified that he had just discovered this incident within a week of the sentencing hearing and that it had occurred in August 2008 after he had completed his investigation of the Heritage Bank case that is the subject of the instant case.

In imposing sentence, the trial court noted the magnitude of the defendant's fraudulent activities by stating, "Gee, Whiz, the [e]ffect of this man on people on the crimes not charged here is staggering, absolutely staggering." The trial court found that the defendant's statements to the probation officer were not credible or reliable. The court also noted that "it's agreed by everybody that this defendant is a Range III Persistent Offender." The trial court gave "little weight" to the defendant's proposed mitigating factor that his "conduct neither caused nor threatened serious bodily injury," *see* T.C.A. § 40-35-113(1), because the defendant's conduct involved "massive fraud." The court then imposed the maximum sentence of six years for each conviction based upon its consideration of the defendant's "previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." *See id.* § 40-35-114(1).

-13-

The record further reflects the trial court's consideration of the principles of sentencing. The court specifically noted that the defendant's potential for rehabilitation was "without a doubt . . . zero, zilch, nada" and that "unless [the defendant] is incarcerated, this man is not going to stop his activities." Based upon this history of criminal convictions and pervasive continuing conduct, the trial court found that the defendant "is an offender whose record of criminal activity is extensive," *see id.* § 40-35-115(2), and ordered the sentences to be served consecutively.

When considering challenges to the length and manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d)(2006). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration and proper weight to the factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing decision, the trial court was required to consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40–35–113 and

40–35–114;

> (6) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40–35–210(b). The trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id*. § 40-35-103(5).

The trial court may impose consecutive sentences if it finds by a preponderance of the evidence that "[t]he defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood," *id*. § 40-35-115(b)(1), or "[t]he defendant is an offender whose record of criminal activity is extensive," *id*. § 40-35-115(b)(2). Here, the trial court determined that the defendant was an offender whose record of criminal activity is extensive. Simply put, we conclude that the record supports these findings.

### *Conclusion*

By failing to file a motion for new trial, the defendant waived review of any appellate issues except sufficiency of the evidence and sentencing. Having discerned no infirmity in the evidence to support the convictions or errors in the trial court's imposition of sentence, we affirm the judgments of the trial court.

_____

JAMES CURWOOD WITT, JR., JUDGE